# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM T. O'NEILL, | ) | Case No. 1:13CV867 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | Magistrate George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | REPORT & RECOMMENDATION OF |
| COMMISSIONER OF | ) | MAGISTRATE JUDGE |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in his decision by failing to: (1) properly analyze his extreme and morbid obesity; (2) find that his impairments medically equaled Listings 1.02 and/or 1.04; (3) consult a medical expert ("ME") in considering whether his impairments met or equaled the applicable Listings; (4) follow the requirements of Social Security Ruling ("SSR") 96-8p; and (5) follow the directives of SSR 96-7p in evaluating his credibility. ECF Dkt. #17. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's complaint in its entirety with prejudice.

## I.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on July 19, 2010 alleging disability beginning June 1,

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

2010 due to a "broken back/back injuries from a car accident" and "head trauma from a car accident." Tr. at 157, 172-176[2].  In his disability application, Plaintiff indicated that he stopped working on July 1, 2007 because he was laid off and could not find another job.  *Id.* at 176.

The Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  Tr. at 69-102.  Plaintiff requested a hearing before an ALJ which was held on January 4, 2012.  *Id*. at 24, 104.

On January 19, 2012, the ALJ issued a decision finding that Plaintiff had the severe impairments of: degenerative disc disease ("DDD"), status-post remote placement of Herrington rods, obstructive sleep apnea and morbid obesity.  Tr. at 14.  The ALJ further found that none of Plaintiff's severe impairments, either individually or in combination, met or equaled a listed impairment in 20 C.F.R. Part 4, Subpart P, Appendix 1.  *Id.* at 15.  He found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the limitations of: the ability to alternate between sitting, standing, and shifting positions at will, so long as he is not off task more than five percent of the workday; occasionally climbing ramps and/or stairs; never climbing ladders, ropes or scaffolds; occasionally stooping, kneeling, crouching or crawling; and no exposure to hazards, such as operational control or moving machinery and unprotected heights.  *Id*. at 15.  Based upon this RFC, the ALJ found that Plaintiff could not return to his past relevant work, but, relying upon the testimony of the vocational expert ("VE"), he could perform other jobs existing in significant numbers in the national economy, such as the representative occupations such as an order clerk, office clerk or a sorter.  *Id*. at 18-19.

---

[2]  Page references are to Page ID Numbers in the transcript of proceedings.

-2-

Plaintiff appealed the ALJ's decision to the Appeals Council, but the Appeals Council denied his request for review.  Tr. at 1-8.  The ALJ's decision therefore became the final decision of the Commissioner.

Plaintiff appealed that decision to this Court on April 17, 2013.  ECF Dkt. #1.  Judge Polster referred the instant case to the undersigned on the same date.  Plaintiff filed his brief on the merits on July 31, 2013,  Defendant filed her brief on the merits on August 27, 2013 and Plaintiff filed a reply brief on September 10, 2013.  ECF Dkt. #s 17-19.

## II.    SUMMARY OF MEDICAL EVIDENCE

On September 8, 2010, Dr. Gerblich conducted a physical examination of Plaintiff at the request of the agency.  Tr. at 223.  He noted that Plaintiff's chief complaint concerned low back pain. *Id.*  Plaintiff informed Dr. Gerblich that he was in a car accident in 1980 and had multiple compressed vertebrae in his spine which resulted in the placement of Herrington rods when he was fifteen years old.  *Id.*  Plaintiff also indicated that he was in another car accident in 1992 and sustained only back contusions and he was on worker's compensation for some time after that.  *Id.*  Plaintiff related that he last worked as a machinist until July of 2008 when he was laid off.  *Id.*  He stated that he could not walk due to his back pain, and he could not sit or stand for long periods of time.  *Id.*

Dr. Gerblich's physical examination revealed that Plaintiff weighed 319 pounds at a height of 67 and 1/4 inches.  Tr. at 224.  He found that Plaintiff had good upper and lower body muscle power, normal hand grasp and manipulation, and normal ranges of motion.  *Id.*  Lumbosacral spine films showed no fractures and L5-S1 disc space narrowing, and thoracic spine films showed the Herrington rods but no evidence of compression fractures and an otherwise normal thoracic spine.  *Id.* at 224, 229-230, 267. Dr. Gerblich diagnosed Plaintiff with low back pain and morbid obesity and found that he had no clear limitations for sedentary activities.  *Id.*

-3-

On September 23, 2010, state reviewing physician Dr. Klyop reviewed Plaintiff's medical records and opined that even with his severe impairments of DDD and obesity, Plaintiff could frequently lift and/or carry up to 10 pounds, occasionally lift and/or carry up to 20 pounds, stand and/or walk for a total of 4 hours, 30 minutes at one time, sit for a total of 6 hours per workday, and occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally stoop, kneel and crouch, and avoidance of all hazards and unprotected heights.  Tr. at 71-76.

Medical records from the Cleveland Clinic show that on November 29, 2010, Plaintiff presented to Dr. Saeed of the Pain Management Center for his low back pain with radiation to his lower extremities.  Tr. at 257.  He rated his pain as a 5 on his best day and 10 on his worst day.  *Id*. He reported poor sleep habits, but indicated that he slept seven hours uninterrupted each night.  *Id*.

Upon examination, Dr. Saeed found no joint pain or swelling, with no back pain to palpation and normal motor and sensory levels.  Tr. at 258.  He found Plaintiff's gait to be antalgic, his posture fair, and his flexion limited.  *Id*.  Plaintiff had normal range of motion in his hips, knees, shoulders and spine, with intact muscle strength and reflexes.  *Id.*  He diagnosed Plaintiff with postlaminectomy syndrome in the lumbar region and referred Plaintiff to Dr. Hsia for an evaluation of his disability. *Id*. at 259.  He also prescribed Tramadol and ordered physical therapy.  *Id*.

On December 6, 2010, Plaintiff presented to the Pain Management Center for the first of three lumbar epidural steroid injections.  Tr. at 254.  Plaintiff rated his pain intensity as a 2 of 10 and described low back pain radiating to both extremities down to his ankles.  *Id.*  His diagnosis was lumbosacral neuritis or radiculitis.  *Id.* at 255.

On December 14, 2010, Plaintiff was evaluated by Dr. Hsia of the Cleveland Clinic Spinal Medical Family Health Center.  Tr. at 248.  Plaintiff told Dr. Hsia that he had low back pain all of his life and it had become worse over the last 2-3 years.  *Id*.  He also had intermittent right leg numbness

-4-

with prolonged sitting.  *Id*.  He indicated that he was applying for DIB due to his constant, achy back pain that became worse with walking, bending, and standing.  *Id*.

Upon examination, Dr. Hsia noted that Plaintiff had decreased flexion, extension and lateral bending, but a normal gait with normal toe and heel walking.  Tr. at 250.  Plaintiff had positive tenderness with lumbar paraspinals, but normal sensation and reflexes.  *Id*.  Dr. Hsia assessed chronic lumbago, status-post lumbar fusion, significant myofascial component, and obesity.  *Id*.  He ordered x-rays and referred Plaintiff to physical therapy.  *Id*.  He also prescribed Tramadol as needed.  *Id*.

The x-rays from December 14, 2010 ordered by Dr. Hsia showed the bilateral rods in Plaintiff's thoracic spine and tiny marginal spurs, but no evidence of fracture or other significant bony or joint abnormality.  Tr. at 263.  Lumbar spine x-rays showed no evidence of fracture, subluxation or spondylolysis, but small marginal spurs in the L1-2 and L2-3 and mild hypertrophic degenerative changes in the facet joints at L5-S1.  *Id*. at 263-265.

Dr. Hsia referred Plaintiff to the Cleveland Clinic Rehabilitation and Sports Therapy Department for a physical therapy spine evaluation.  Tr. at 242.  Plaintiff informed the physical therapist that he has had back pain his entire life due to the Herrington rods and it was getting worse over the last two to three years.  *Id*.  He indicated that he could not walk more than 25-30 yards before he had to sit down, he could not sit longer than one hour, and he had to change positions to stay comfortable.  *Id*.  He reported that all things are painful for him to do, like climbing stairs and doing housework.  *Id*.  He could not drive a car for more than 1 hour or his right leg would become numb. *Id*.  He rated his pain as a 1 out of 10.  *Id*.  He explained that he was most comfortable lying down and he slept comfortably at night.  *Id*.  He had started the medications prescribed for him and had his first of three epidural injections.  *Id*.  Plaintiff was living with his parents.  *Id*. at 243-244.

-5-

The physical therapist indicated that Plaintiff presented with chronic back pain over 30 years that had been progressively worsening. Tr. at 245. He noted that Plaintiff was very sedentary which originated because of his back pain, but now was actually contributing to the problem. *Id*. He noted Plaintiff's decreased range of motion and decreased flexibility, strength, balance, and tolerance for standing, sitting, walking, driving, rising from a chair and lifting. *Id*. He advised Plaintiff to become active and recommended physical therapy. *Id*. He assessed Plaintiff's rehabilitation potential as fair, secondary to the chronicity of pain and Plaintiff's obesity and inactivity. *Id*.

A progress note from January 3, 2011 shows that Plaintiff presented for his second steroid injection after reporting that the first gave him only minimal relief. *Id*. at 239. He described his pain as a 10 on a 10-point intensity scale and indicated that it was aching and constant and located in the lower back and radiating down both extremities down to his ankles. *Id*.

A progress note from January 17, 2011 shows that Plaintiff underwent his third injection after reporting no relief from the prior two injections. *Id*. He indicated that he had tenderness over his lumbar spine and lumbar paraspinal muscles. *Id*. Plaintiff described his pain as aching and constant in his low back with radiation to both lower extremities down to his knees. *Id*. Plaintiff was taking Flexeril and Tramadol. *Id*. at 239. He was diagnosed with lumbosacral neuritis/radiculitis. *Id*. at 241.

On February 17, 2011, Dr. McKee, a state reviewing physician, considered Plaintiff's record, including updated medical evidence, and opined the same limitations as Dr. Klyop. Tr. at 78-84.

On February 28, 2011, Plaintiff presented to Dr. Saeed for evaluation of his low back pain. Tr. at 277. Plaintiff reported good sleep habits of 8 hours of uninterrupted sleep per night. *Id*. He rated his pain as a 10 of 10 and explained that standing and walking aggravated his pain while sitting and resting helped alleviate it. *Id*. Upon examination, Dr. Saeed found that Plaintiff had tenderness

to palpation in the lumbar facets and paraspinal muscles, and limited flexion and extension.  *Id*.  He diagnosed postlaminectomy syndrome of the thoracic region.  *Id*.  Dr. Saeed noted that Plaintiff had informed him that epidural blocks, physical therapy and Tramadol did not help his pain, and when Dr. Saeed recommended facet injections and referral to a spine surgeon, Plaintiff indicated that he was afraid of surgery and needles.  *Id*. at 277-278.  Dr. Saeed referred Plaintiff to Dr. Maleki for evaluation for medical management at the Chronic Pain Rehabilitation Program.  *Id*. at 278.  He also prescribed Naproxen in addition to the Tramadol and Flexeril.  *Id*.

Plaintiff participated in physical therapy beginning in March of 2011 for his low back pain. Tr. at 294.  On April 1, 2011, he reported that he felt worse since starting physical therapy.  *Id*.  At each session, it was reported that Plaintiff was very limited with all of the exercises and activities due to pain.  *Id*. at 294-302.  Plaintiff reported continued and increased pain.  *Id*.

Plaintiff returned to Dr. Hsia on March 3, 2011 and Dr. Hsia noted in Plaintiff's history that Plaintiff quit his job as a welder due to back pain.  Tr. at 310.  Dr. Hsia referred Plaintiff back to physical therapy as a misunderstanding had occurred concerning the last referral to therapy.  *Id*. Plaintiff reported that he spent most of his time lying down or sitting and his pain was a 10/10.  *Id*. Dr. Hsia noted that x-rays showed no evidence of fracture, subluxation or spondylolysis and also showed good mobility without evidence of instability, and with only small marginal spurs and mild degenerative changes.  *Id*. at 310-311.  He found no evidence of significant arthritis.  *Id*. at 311.  He thought Plaintiff would be a good candidate for bariatric surgery but Plaintiff had no insurance.  *Id*.

On May 16, 2011, Plaintiff was evaluated by Dr. Sweis of the Chronic Pain Management Program of the Cleveland Clinic at the request of Dr. Saeed.  Tr. at 324.  Plaintiff reported that his average pain severity was 2 or 3 of 10.  *Id*.  He indicated that his pain is a 2 or 3 of 10 when relaxing,

sitting or laying down and is a 10/10 when standing and walking.  *Id.*  He reported poor sleep habits of 7 hours of uninterrupted sleep per night and he felt unrested in the morning.  *Id.*

Dr. Sweis noted the tiny marginal spurs on the thoracic and lumbar spine x-rays and the mild degenerative changes on the lumbar spine.  Tr. at 325.  Dr. Sweis rated Plaintiff's pain disability index score as 56/70, "suggesting severe functional impairment."  *Id.*  He noted that Plaintiff's time spent reclining in bed, a recliner, sofa or ottoman was 20 hours per day.  *Id.*  Plaintiff reported that he was laid off from welding /machine work and was not able to find a job.  *Id.* at 326.

Dr. Sweis' impressions were lumbago, post laminectomy syndrome of the thoracic region, knee joint pain, and shoulder joint pain.  Tr. at 326.  He reported that Plaintiff thought he could take a "magic" pill that would alleviate his pain and allow him to stand and walk without intense pain.  *Id.*  Dr. Sweis recommended that Plaintiff participate in the chronic pain reduction program, but Plaintiff's financial situation and lack of health insurance would place too much of a burden on him to pursue this program.  *Id.*  Dr. Sweis therefore suggested that Plaintiff schedule an outpatient appointment with a chronic pain reduction program nurse for a medication consult and pharmacological intervention.  *Id.*  He also recommended weight management and smoking cessation programs, a chronic pain support group, and vocational counseling if Plaintiff achieved adequate functioning.  *Id.* at 326-327.

On August 12, 2011, Plaintiff met with a nurse at the chronic pain reduction program for medication recommendations.  Tr. at 321.  Plaintiff reported that his pain was only relieved by sitting or lying down and his worst, least, average and current pain levels were all at 10.  *Id.*  He indicated that Dr. Saeed had prescribed Tramadol, Naprosyn and Flexeril, but he stopped taking all of these medications after only one prescription of each because they did not help and he could not afford them.  *Id.*  The nurse suggested that Plaintiff receive treatment in the Chronic Pain Rehabilitation

Program while he had insurance, but Plaintiff was reluctant to consider it.  *Id.* at 322.  She then recommended a trial of Meprotiline after Plaintiff had an EKG first.  *Id.*

On November 2, 2011, Plaintiff referred himself to Dr. Koniarczyk of the Cleveland Clinic for a "comprehensive problem evaluation."  Tr. at 288.  Plaintiff's active problem list included postlaminectomy sydrome in the thoracic region, lumbosacral neuritis or radiculitis, lumbago, other physical therapy, obesity, and abnormal ECG.  *Id.*  Dr. Koniarczyk noted that Plaintiff was trying to get DIB for limitations secondary to his back pain.  *Id.* at 289.  Physical examination revealed normal results and Dr. Koniarczyk ordered a stress and blood test, finding that the abnormal ECG was likely a silent/old inferior infarct.  *Id.* at 290.  He recommended that Plaintiff take aspirin daily and a beta blocker, but he noted that Plaintiff was extremely hesitant to take new medications because of unknown side effects.  *Id.*  He explained that the benefits of taking the medications outweighed the risks.  *Id.*  Plaintiff also declined blood pressure medicine, explaining that he had normal blood pressure readings at his other appointments.  *Id.*  Plaintiff also refused a CPAP machine or repeat study concerning obstructive sleep apnea.  *Id.*  Dr. Koniarczyk advised Plaintiff to stop smoking.  *Id.* at 291.

On November 11, 2011, Dr. Saeed referred Plaintiff for chiropractic treatment from Dr. Torzok at the Cleveland Clinic Sports Health Family Health Center.  Tr. at 270.  Plaintiff informed Dr. Torzok of his chronic back pain and he reported that physical therapy did not help.  *Id.*  He rated his pain as an 8 out of 10 which was made worse by standing and walking.  *Id.*  He denied leg pain, numbness, tingling or weakness.  *Id.*  It was noted that Plaintiff was attempting to obtain DIB.  *Id.* at 271.

Upon examination, Dr. Torzok found that Plaintiff could toe and heel walk without difficulty, he had limited lumbar flexion, normal motor strength at L1-S1, and good range of motion in his hips. *Id.*  Dr. Torzok ordered lumbar x-rays, which showed no fracture, satisfactory alignment, and normal

-9-

vertebral body heights and disc spaces.  *Id*. at 272.  Dr. Torzok recommended that Plaintiff not receive chiropractic services as it was unlikely to help his chronic pain and would make his pain worse.  *Id.*

On November 15, 2011, Plaintiff underwent a stress test which showed normal results with no evidence of ischemia.  Tr. at 315.

On November 18, 2011, Dr. Saeed referred Plaintiff for a physical capacity evaluation by South Pointe Hospital, a Cleveland Clinic Provider, for the purposes of disability determination.  Tr. at 282-283.  Occupational Therapist Christine Ontko noted Plaintiff's diagnosis of lumbago and his obesity and past abnormal ECG.  *Id*. at 283.  She indicated that Plaintiff last worked in 2008 and he had been unable to find work since that time.  *Id.*  She noted that he ambulated normally and had normal vision, hearing, communication, psychosocial, perception, motor planning and body integration.  *Id.*

However, Ms. Ontko found that Plaintiff's work tolerance was severely limited for any sustained activity.  Tr. at 283.  His sensation was intact in his bilateral upper extremities, but absent in the bilateral ankles.  *Id*.  She noted that Plaintiff reported a 1/10 pain level at the beginning of the evaluation, but he groaned and declined to try  to complete tasks or was unable to complete them as he reported that his pain increased and was 9/10 by the end of the evaluation.  *Id*.  Plaintiff had impaired bilateral grip strength which Ms. Ontko noted was indicative of submaximal effort.  *Id*.

Plaintiff showed normal range of motion in his cervical spine, and normal range of motion and strength in his upper extremities, with some give-away weakness.  Tr. at 283.  His lower extremity strength was within functional limits, but his trunk range of motion was impaired, as well as backward bending, side bending, straight leg raising and knee to chest.  *Id*.  Ms. Onto indicated that Plaintiff was able to sit for 45 minutes, could lean forward, sit and stand, static and active stand for less than five

-10-

minutes, walk slowly for 50 feet, walk backward 10 feet and walk heel to toe for 12 feet.  *Id*. at 284.
He was able to carry 23 pounds a distance of 30 feet.  *Id*.

Based upon her testing, Ms. Ontko indicated that Plaintiff had the physical capacity to perform
light work as he could lift 5 pounds constantly, 12 pounds frequently and 23 pounds occasionally.  Tr.
at 282.  She noted that Plaintiff was extremely pain-focused and related every task to how it would
affect his pain.  *Id*.  She recommended a pain management program in order to address his work
tolerance deficits and build his endurance for sustained activity.  *Id*.  She also recommended a weight
loss and smoking cessation program because Plaintiff's obesity and smoking were negatively
impacting his overall health and endurance.  *Id*.  Ms. Ontko also suggested that upon completion of
the programs, Plaintiff would need vocational retraining in order to return to work and he could not
return to a heavy job like welding.  *Id*.

On December 19, 2011, Dr. Koniarczyk noted that Plaintiff's blood test results showed that
his Vitamin D levels were extremely low, so he sent a Vitamin D prescription to the pharmacy.  Tr.
at 350.  He also noted that Plaintiff's average sugar for the past 2-3 months were very high, so he
recommended that Plaintiff start an oral medication in addition to the Metformin already prescribed
once Plaintiff completed his nurse diabetes education visit.  *Id*.

On February 28, 2012, Plaintiff followed up with Dr. Koniarczyk for his diabetes mellitus,
hypertension, and hyperlipidemia.  Tr. at 336.  Plaintiff took diabetes mellitus classes and was
following a diabetic diet.  *Id*. at 335.  He was compliant with medications and tolerating them without
side effects.  *Id.*  Plaintiff indicated that he was feeling well and denied any hypertension symptoms.
*Id*.  He also reported doing well with diet and exercise for his hyperlipidemia*.  Id.*  Dr. Koniarczyk
increased Plaintiff's diabetes medication, and diagnosed diabetes mellitus, diabetic nephropathy,

hypertension, tinea pedis and thrombocytopenia.  *Id.* at 336.

On April 30, 2012, Plaintiff presented to Dr. Koniarczyk for follow up of his conditions. Tr. at 330.  Plaintiff indicated that overall he was doing well and he had lost 37 pounds through dietary changes.  *Id.*  Dr. Koniarczyk noted that Plaintiff was diagnosed with diabetes mellitus in December of 2011 and he was compliant with and tolerating his medications.  *Id.*  He also was compliant with and had good control of his hypertension.  *Id.*  at 331.  He had only suboptimal control over his hyperlipidemia and Dr. Koniarczyk recommended a low fat, low cholesterol diet.  *Id.*

**III.**    **SUMMARY OF TESTIMONY**

On January 4, 2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a VE testified.  Tr. at 24.  Plaintiff explained that he stopped working on July 4, 2008 because he could no longer perform jobs relating to welding, machining and driving as he had to carry and lift a lot of materials, such as saws and tables.  *Id.* at 31.  He had been performing such duties for the last fifteen years, even after his car accidents and the placement of the rods in his back.  *Id.* at 32.

Plaintiff explained that his back pain had worsened over the last four to five years and he was no longer able to stand for very long or walk far.  Tr. at 33.  He indicated that he tried physical therapy, but it just brought on more pain, and he was prescribed medications and underwent injections, but they did not work.  *Id.* at 34-35.  He described his pain as an 8 on a 10-point scale on a good day and a 10 on a bad day.  *Id.* at 36.  Lying down or sitting down relieves the pain.  *Id.*

Plaintiff reported that he can take out the trash at home once per week, but he experiences pain thereafter.  Tr. at 38-39.  He used to cut the grass, but would have to sit for five or ten minutes after two passes before completing a few more passes.  *Id.* at 39.  The small yard would  take Plaintiff two hours to cut.  *Id.*  at 40.  He stated that he rakes leaves with breaks, but it takes him all day when it

should only take a couple of hours.  *Id.*

Plaintiff surmised that his last employer gave him preferential treatment because he was able to perform his job by spending less time on his feet as his employer knew about the car accident and his back.  Tr. at 42-44.  Plaintiff indicated that he had no issues with sitting except when he had to drive more than one hour as he needed to get up, stand, walk around and stretch.  *Id*. at 44.  Plaintiff thought that he could sit for one hour before he would have to get up and stretch and he could sit for a few hours per eight-hour workday with breaks.  *Id*.  at 45.  He described a typical day as waking up, getting breakfast, going back upstairs and lying down watching television, and taking a nap.  *Id*. at 53-55.  He visited with his brothers or his friends, he is able to drive himself, and he cannot go into a store unless he can find somewhere to sit down and rest.  *Id*. at 55.  When asked why he chose June 1, 2010 as his onset date, he said that he could not find a job and he knew he needed help.  *Id.* at 54.

The VE then testified.  He reviewed Plaintiff's past relevant work.  Tr. at 58-59.  The ALJ presented a hypothetical person with Plaintiff's age, education and work background who could perform sedentary work with a sit/stand option at will, so long as the person was not off task more than 5% of the work period.  *Id*. at 60.  The ALJ also limited the hypothetical individual to occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, and no exposure to hazards such as moving machinery or unprotected heights.  *Id.*  The VE testified that such a person could not perform Plaintiff's past relevant work, but he could perform a significant number of jobs existing in the national economy, including the occupations of inspector, sorter, or order clerk.  *Id.* at 60-61.

The ALJ modified the hypothetical individual to include an individual who could not engage in even sedentary work on a regular and consistent basis.  Tr. at 62.  The VE testified that such a person could not perform any past relevant work or any other jobs existing in significant numbers in the national economy.  *Id.*

Plaintiff's counsel questioned the VE, asking him if grip strength was a requirement of the jobs

that he had identified.  Tr. at 63.  The VE indicated that the inspection and sorting jobs would be limited by a frequent grip restriction and such jobs would be eliminated by a limitation to only occasional gripping.  *Id*.  Plaintiff's counsel also asked about employer tolerance of being off task, which the VE responded employers would tolerate an employee being completely off task only up to 5% of the time.  *Id.* at 64.

### IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R.  404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R.  404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).   The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and RFC.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social Security Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.    ANALYSIS

### A.     OBESITY

Plaintiff first asserts that the ALJ committed reversible error when he failed to properly analyze his obesity at all of the required steps in accordance with Social Security Ruling ("SSR") 02-1p. ECF Dkt. #17 at 13-16. For the following reasons, the undersigned recommends that the Court find no merit to this assertion.

The social security regulations require that ALJs consider the effects of obesity as part of their adjudication of a claim for benefits at Steps Two through Five of the sequential evaluation process. *See* SSR 02-1p; *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir.2011). SSR 02–lp recognizes that obesity may affect an individual's ability to perform the exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling, as well as an individual's ability to perform

postural functions such as climbing, balancing, stooping, and crouching.  SSR 02–1p, 2000 WL 628049, at *6.  However, SSR 02–lp does not mandate a particular mode of analysis and does not establish whether obesity is a severe impairment or whether it correlates with any degree of functional loss.  *Id.; Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir.2006).  Rather, the Ruling simply recognizes that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations."  *Id.* at 418 (quoting SSR 02-1p).

Here, while Plaintiff correctly notes that he has been diagnosed with morbid obesity, he did not present sufficient evidence to the ALJ that his obesity impacted his ability to work.  First, he did not list obesity as an impairment in his disability application or in his contacts with the agency.  ECF Dkt. #16 at 176, 179, 182, 188, 201, 204-211; *see also Cranfield v. Comm'r of Soc. Sec.*, 79 Fed. App'x 852, 857 (6th Cir.2003) (ALJ did not commit error in not addressing claimant's obesity in his decision when claimant failed to indicate that obesity was a significant impairment and neither claimant not doctors "offered any evidence to suggest that her weight was a significant impairment."); *see also Stevens v. Comm'r of Soc. Sec.,* 2013 WL 1399178 (N.D. Ohio Apr. 5, 2013)(holding that "[i]t is a mischaracterization of the Rule [SSR 02-1p] to suggest that the ALJ is obligated to consider obesity in every case" and finding that obesity was not medically determinable factor to consider in sequential evaluation because no evidence was presented to show that claimant's obesity increased the severity of her other impairments); *Smith v. Astrue, No.* 3:10CV1829, 2012 WL 1232272, at *4 (N.D. Ohio Apr. 12, 2012), unpublished (ALJ did not err in failing to address obesity in decision where claimant called attention to her height and weight, but failed to present any evidence that obesity impacted her ability to work); *Young v. Comm'r of Soc. Sec.*, No. 3:09CV 1984, 2011 WL 2182869, at *7 (N.D. Ohio June 6, 2011)(ALJ not required to address obesity in decision because although claimant provided evidence of obesity, no diagnosis of obesity existed, claimant failed to allege obesity as impairment, failed to complain of obesity in testimony, and failed to furnish evidence

of impact obesity had on ability to work); *Benson v. Astrue*, No. 1: 10CV 1654, 2011 WL 6122944, at *9 (N.D.Ohio Nov.15, 2011), unpublished, Report and Recommendation adopted by 2011 WL 6122942 (N.D.Ohio Dec.9, 2011), unpublished (although record showed claimant's height and weight, ALJ did not err in failing to address obesity in decision because claimant failed to present ALJ with evidence of how weight impacted ability to work).

In addition, at the hearing before the ALJ, Plaintiff testified that he had been overweight his whole life.  He did not report that his obesity caused any limitations in his ability to work, especially since he indicated that he had been obese his "whole life" and was able to perform jobs at the medium level of exertion.  ECF Dkt. #16 at 50.  Plaintiff indicated that his doctors had advised him to lose weight and he had lost ten to fifteen pounds over the last year after finding out that he was diabetic and realizing that he did not "have a choice anymore." *Id*. at 50-51.  Moreover, x-rays showed little more than mild degenerative changes in his lumbar spine and tiny spurs in his neck and back and none of the physicians who diagnosed him with obesity offered any physical limitations but they recommended that Plaintiff lose weight by eating better and increasing his exercise. *Id.* at 224, 229-230, 250-253 , 267-268, 282, 290, 310-311, 322, 324-326, 331, 343-345, 353, 360.  Despite the findings that Plaintiff had the allegedly disabling impairments prior to his alleged onset date and was still able to work, the ALJ nevertheless found Plaintiff's obesity to be a severe impairment and accommodated the impairment in his RFC by limiting Plaintiff to sedentary work with additional postural limitations of an alternating sit/stand/shift option, occasional climbing of ramps and/or stairs, no climbing of ladders, ropes or scaffolds, occasional stooping, crouching, kneeling or crawling, and no exposure to hazards. *Id*. at 15.

Given Plaintiff's failure to identify obesity as one of his impairments, his failure to present evidence that his obesity increased the severity of his other limitations, Plaintiff's testimony that he had been overweight his entire life and was still able to work, and the ALJ's identification of obesity

-17-

as a severe impairment Step Two with accommodations of this impairment in his RFC for Plaintiff, the undersigned recommends that the Court find that the ALJ did not commit reversible error in failing to address or accommodate Plaintiff's obesity.

## B.    LISTINGS 1.02 AND 1.04 AND IMPAIRMENTS IN COMBINATION

Plaintiff also asserts that substantial evidence does not support the ALJ's Step Three finding that his extreme obesity, spine disorder, sleep apnea and chronic pain combined to medically equal Listing 1.04 and the ALJ failed to consider whether his conditions medically equaled Listing 1.02. ECF Dkt. #17 at 14-16.  The undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff's impairments did not medically equal the Listings.

The undersigned notes that the scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards and whether substantial evidence supports the findings of the Commissioner.  *Abbott*, 905 F.2d at 922.  Moreover, this Court cannot reverse the ALJ's decision if it is supported by substantial evidence, even if substantial evidence exists that would have supported an opposite conclusion.  *Walters*, 127 F.3d at 528.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii) ). An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415.  An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by the medical evidence are equivalent in severity and duration to that of a listed impairment. *See Land v. Sec'y of H & HS*, 814 F.2d 241, 245 (6th Cir.1986) (citing 20 C.F.R. § 1526(b)). A decision of medical equivalency, however, must be

based solely on medical evidence supported by acceptable clinical and diagnostic techniques. *Id.*

It is the claimant's burden to show that he meets or medically equals an impairment in the Listings.

*Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987) (per curiam).

Plaintiff contends that his impairments medically equal Listings 1.02 and/or 1.04, which read:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The ALJ provided the following analysis of Plaintiff's impairments under Listing 1.04:

> In making this finding, I considered the requirements of listing 1.04. However, images of the claimant's spine do not reveal compromise of a nerve root. (Exhibits 1F, 2F/23, 3F, 4F/4/). Additionally, there is no evidence that the claimant suffers from nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. Accordingly, the claimant's degenerative disc disease does not meet or medically equal the requirements of listing 1.04.

> * * *

> Finally, the claimant's severe impairments do not meet or medically equal any applicable listing, even when the additional and cumulative effects of obesity are considered. (SSR 02-1p.).

The undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff's impairments did not medically equal Listings 1.02 or 1.04. As the ALJ noted with regard to his analysis of Listing 1.04, none of Plaintiff's x-rays showed that he had nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication. Tr. at 15. The ALJ cited to Plaintiff's x-rays showing disc space narrowing, marginal spurs, the Harrington rods from the prior surgery, and mild degenerative changes. Tr. at 229-230, 252-253, 397. Further, even if Plaintiff's condition satisfied this first part of Listing 1.04, Plaintiff has failed to show that he medically equals the positive straight leg-raising requirement of Listing 1.04A as the medical record shows that his positive straight leg-raising tests were negative. *Id*. at 244, 250, 258, 277, 311.

As to Listing 1.02, the ALJ did not specifically discuss this Listing at Step Three. However, "[t]he mere failure to discuss every single impairment under the step three analysis is not a procedural error." *Bledsoe*, 165 F. App'x at 411. Although the ALJ did not state that he considered Plaintiff's conditions under Listing 1.02, he did consider Listing 1.04 and Listing 3.10 for obstructive sleep

apnea and thereafter stated that Plaintiff's "severe impairments do not meet or medically equal any applicable listing, even when additional and cumulative effects of obesity are considered." Tr. at 15.

Plaintiff and Defendant discuss the definition of the "ability to ambulate" under Listing 1.00B2b of 20 C.F.R. Pt. 404, Subpt. P, app. 1 ("Listing 1.00B2b") and whether Plaintiff meets that definition.  ECF Dkt. #17 at 15-16; ECF Dkt. #18 at 12; ECF Dkt. #19 at 4-5.  The ability to ambulate effectively is a requirement to be met or equaled in both Listing 1.04(c) and Listing 1.02.  Listing 1.00B2b provides in relevant part that:

> b.    What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Listing 1.00B2b.  Listing 1.00Q provides that disturbance of the musculoskeletal system can be "a major cause of disability" in claimants with obesity.  Listing 1.00Q. It further explains that "the combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately."  *Id.*  As a consequence, Listing 1.00Q requires that ALJs consider any additional and cumulative effects of obesity in

determining whether a claimant with obesity has a listing-level impairment or a combination of impairments.  *Id*. With regard to medically equaling Listing 1.04C, Plaintiff correctly states that "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing," including musculoskeletal, respiratory and cardiovascular impairments.  SSR 02-1p; ECF Dkt. #17 at 16.  However, that Ruling goes on to state that "we will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record."  SSR 02-1p.

Plaintiff contends that the record establishes that he cannot sustain effective ambulation and his conditions therefore medically equal Listings 1.02 and/or 1.04(c) as both require the inability to ambulate effectively.  ECF Dkt. #17 at 15-16; ECF Dkt. #19 at 4-5.  He points to his testimony that he cannot go shopping without difficulty, he can walk only short distances, his hip flexion was limited due to his obesity, and his lower extremity mobility is limited by the girth surrounding his abdominal area, leading to hip limitations.  *Id.*

The ALJ considered Plaintiff's testimony that he could stand and/or walk for only thirty minutes at a time.  Tr. at 16.  He also noted that Plaintiff's morbid obesity would be expected to exacerbate the symptoms of his other severe impairments.  *Id*.  He cited SSR 02-1p in indicating that he had considered the additional and cumulative effects of Plaintiff's obesity on his other impairments. *Id*. at 15.  However, the ALJ noted that x-rays showed no significant arthritis and only marginal abnormalities, and physical examinations revealed that Plaintiff had good upper and lower muscle strength, and the ability to walk on his heels and toes without difficulty.  *Id.*, citing Tr. at 54, 229-230, 250, 271.  The ALJ also noted that Plaintiff presented to a therapy evaluation with only minimal range of motion and strength deficits.  *Id.*, citing Tr. at 283. He further noted that Plaintiff's impairments

were present at the same level of severity as they were prior to his alleged onset date when he was able to work full-time and no objective medical evidence showed that the impairments had worsened since that time.  *Id*., citing Tr. at 54, 229-230.  He further indicated that Plaintiff took no pain medications and he declined facet injections.  *Id*.  Moreover, Plaintiff required no assistive devices to aid him in ambulating and numerous medical sources noted that Plaintiff had a normal gait, no sensory loss, and normal range of motion in his lower extremities and hips.  *Id*. at 224, 250, 258, 277, 281, 283-284, 290.  Plaintiff points to a notation by a physical therapist at the Cleveland Clinic Sports and Orthopedic Rehabilitation Department who indicated that Plaintiff's lower extremity mobility was limited "only by girth surrounding abdominal area, leading to some hip limitations."  *Id.* at 295.  However, that therapist also noted that Plaintiff ambulated without assistive devices and with minimal deviations in his gait.  *Id*.  She further indicated that he had minimal range of motion and strength deficits.  *Id*. at 296.  She opined that while Plaintiff still experienced pain, he would nevertheless benefit from becoming more active.  *Id.*  She also questioned Plaintiff's representation that he was performing assigned exercises at home and she noted that his motivation was limited.  *Id*. at 299, 302.

Plaintiff quotes Listing 1.00B2b(2)'s definition of ambulating effectively and indicates that uncontroverted evidence established that he was unable to walk at a reasonable pace and was unable to carry out routine ambulatory activities, such as shopping and banking.  ECF Dkt. #19 at 4-5.  However, the occupational therapist who evaluated Plaintiff opined that Plaintiff demonstrated the ability to perform work at the light work level.  Tr. at 282.  She noted that Plaintiff ambulated normally.  *Id*. at 283.  Dr. Gerblich, the agency examining physician, opined that Plaintiff had no limitations in performing sedentary activities.  *Id*. at 224.  Further, none of the doctors who examined Plaintiff provided any limitations on his activities.  Dr. Hsia, who evaluated Plaintiff for disability at the request of Dr. Saeed, noted no evidence of fracture, subluxation or spondylolysis, found good lumbar mobility without evidence of instability and no significant arthritis, and found Plaintiff's gait

to be normal.  *Id.* at 311.  He referred Plaintiff to physical therapy and requested that he return in four months.  *Id.*  The ALJ cited to all of these factors.  *Id.* at 16-18.  He also noted inconsistencies in some of Plaintiff's statements to providers, including the reason why he left his last job, telling some that he was laid off and filed for disability after his unemployment compensation ran out and telling others that he quit or was let go because of his inability to perform the job due to his back pain.  *Id.* at 17.

Insofar as Plaintiff's sleep apnea and chronic pain combining with his spine disorder in order to medically equal Listing 1.04, the ALJ noted the inconsistent statements concerning Plaintiff's sleep apnea, including his testimony that he was never prescribed a CPAP machine for his sleep apnea, compared to the medical records stating that he refused a CPAP machine in November of 2011.  Tr. at 17.  The ALJ also noted that Plaintiff reported to numerous medical providers that despite his obstructive sleep apnea, he got seven to eight hours of uninterrupted sleep per night.  *Id.* at 16.  And the ALJ found that despite his chronic pain, Plaintiff did not take pain medications and declined facet injections.  *Id.* at 17.  The ALJ further relied upon the findings of Dr. Gerblich, who noted that Plaintiff's pain complaints were most likely secondary to the disc space narrowing shown on the x-rays and nevertheless found that Plaintiff could perform sedentary work activities.  *Id.*, citing Tr. at 224.  He also relied upon the opinions of two agency reviewing physicians also opined that Plaintiff's impairments, individually and in combination, did not meet or medically equal a Listing.  Tr. at 74, 84-85.

Plaintiff has not provided an adequate basis to conclude that remand for the ALJ to more fully explain his step three analysis might lead to a different result. The regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence. Further, the ALJ makes express reference to the consideration of the "combination of impairments" in concluding that such impairments do not meet or medically equal the severity of any

of the listed impairments in the Listings. A reference to "a combination of impairments" by the ALJ in the hearing decision is sufficient to satisfy the requirement. See *Gooch v. Sec'y of HHS*, 833 F.2d 589, 591–92 (6th Cir.1987), cert. denied, 484 U.S. 1075 (1988); *Loy v. Sec'y of HHS*, 901 F.2d 1306, 1310 (6th Cir.1990)("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.").

For these reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not, individually or in combination, equal Listings 1.02 or 1.04 and the ALJ provided sufficient articulation of such findings.

### C.    MEDICAL EXPERT

Plaintiff also asserts that the ALJ erred by not consulting a ME in determining whether his impairments met or equaled the Listings.  ECF Dkt. #17 at 18-19.  Plaintiff acknowledges that it is within the ALJ's discretion to determine if medical expert testimony is necessary.  ECF Dkt. #17 at 18; 20 C.F.R. §§ 404.1527(e)(2)(iii).  However, Plaintiff asserts that the interplay between his obesity, spine disorders, chronic pain, and sleep apnea were beyond the ALJ's knowledge and none of the medical opinions considered the entire medical record.  *Id*. at 19.  He asserts that the ALJ should have also explained why he decided not to use a ME.  *Id.*

20 C.F.R. § 404.1527(e)(2)(iii) provides in relevant part that:

> Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart.

20 C.F.R. § 404.1527(e)(2)(iii).  Thus, ALJs retain discretion as to whether to call a medical expert. *Davis v. Chater*, 104 F.3d 361, No. 95-2235, 1996 WL 732298, at *2.  SSR 96-6p provides that:

> Longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before

the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p.  The Ruling indicates that this requirement can be met when the record includes one of the several listed documents signed by a state agency medical consultant, including the disability determination and transmittal forms.  *Id.*  SSR 96-6p goes on to state that an ALJ must obtain an updated medical opinion from a medical expert in two situations:

> * When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> * When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.*

In the instant case, two state agency physicians found that Plaintiff's impairments did not meet or equal a listing, whether individually or in combination.  Tr. at 70-86.  Moreover, Dr. Gerblich, the agency examining physician, conducted a disability evaluation and found that Plaintiff had no clear limitation for sedentary activities.  *Id.* at 224.  Since state agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," their opinions that a claimant does not meet or equal a listing may be adopted by the ALJ. *See* 20 C.F.R. §§ 404.1527(e)(2)(i). The undersigned recommends that the Court find that the ALJ did not commit error by declining to solicit the testimony of a ME when he had two agency physicians opine that Plaintiff's impairments did not individually or combination meet or equal a Listing and three agency physicians opine that he could perform work-related activities despite his impairments.  While Plaintiff complains that none of these physicians had the benefit of a full medical record, since the last agency physician to review the record was on February 17, 2011, Plaintiff does not explain how his

impairments since that time had changed such that they medically equaled a Listing.  Nor does he explain how any medical evidence after February 17, 2011 would have altered the physicians' opinions.

### D.  RFC

Plaintiff also challenges the ALJ's RFC finding, asserting that substantial evidence does not support the RFC and the ALJ failed to follow the requirements of SSR 96-8p.  ECF Dkt. #17 at 19-22.

It is the ALJ who is responsible for determining a claimant's RFC.  20 C.F.R. § 404.1546(c); *Fleisher v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011).  The RFC is the most that a claimant can still do despite his restrictions.  SSR 96-8p.  It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*.  It is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id*.  The Ruling defines a "regular and continuing basis" as 8 hours per day, five days per week, or the equivalent thereof. *Id.*

In determining a claimant's RFC, SSR 96-8p instructs that the ALJ must consider all of the following:  (1) medical history; (2) medical signs and lab findings; (3) the effects of treatment, such as side effects of medication, frequency of treatment and disruption to a routine; (4) daily activity reports; (5) lay evidence; (6) recorded observations; (7) statements from medical sources; (8) effects caused by symptoms, such as pain, from a medically determinable impairment; (9) prior attempts at work; (10) the need for a structured living environment; and (11) work evaluations.  SSR 96-8p.  The ALJ must provide "a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities,

observations).”  *Id*.  The ALJ must also thoroughly discuss objective medical and other evidence of symptoms such as pain and set forth a “logical explanation” of the effects of the symptoms on the claimant’s ability to work.  *Id*.

In the instant case, the undersigned recommends that the Court find that substantial evidence supports the ALJ’s RFC and he adequately fulfilled the requirements of SSR 96-8p.  The ALJ reviewed Plaintiff’s medical history, citing his history of a back injury, recent x-rays of Plaintiff’s back and neck showing disc space narrowing at L5-S1 and mild degenerative changes, and numerous examinations indicating that Plaintiff could heel and toe walk without difficulty, he had minimal ranges of motion, and he had minimal strength deficits.  Tr. at 16, citing Tr. at 223-230, 242-245, 271, 296.  He cited to Plaintiff’s diagnosis of obstructive sleep apnea, noting that despite such a diagnosis, Plaintiff told medical providers that he gets seven to eight hours of uninterrupted sleep each night. Tr. at 16, citing Tr. at 277.  The ALJ also discussed Plaintiff’s obesity, indicating that he was morbidly obese, which would be expected to exacerbate the symptoms of his other impairments.  Tr. at 16.

In addition to the medical history and most current records, the ALJ also discussed Plaintiff’s medical treatment, including the facts that he does not take pain medications, he at one time declined facet injections, and he does not use a CPAP machine for his sleep apnea.  Tr. at 17, citing Plaintiff’s hearing testimony.  The ALJ also set forth Plaintiff’s daily activities, including his abilities to prepare meals, drive a car, visit with friends and family regularly, and to ascend and descend steps multiple times per day.  *Id*.  He also cited to the third party statements from Plaintiff’s relatives and friends, indicating that he gave them limited weight because they were not acceptable medical sources and because they were vague in their statements that Plaintiff could not sit, stand or walk for “long periods.”  *Id*. at 18.  The ALJ indicated his reliance upon the observations, findings, and opinions of the medical providers, including Plaintiff’s physical therapist, the occupational therapist, the state agency medical consultants, and Dr. Gerblich, the state agency examining physician.  *Id*.  He

attributed the most weight to the opinion of Dr. Gerblich, who found that Plaintiff could perform sedentary work, and gave little weight to the opinions of the state agency consultants, who opined that Plaintiff could perform light work.  *Id.*  Finally, the ALJ also cited to Plaintiff's allegations of pain, but noting that objectively the medical evidence did not show a worsening of his condition since he was last able to work, he took no pain medications, he had conservative treatment, and he provided inconsistent reasons for leaving his prior job.  *Id*. at 17.

Based upon a review of the ALJ's decision, the undersigned recommends that the Court find that the ALJ adequately addressed the factors of SSR 96-8p in his decision.

Plaintiff asserts that the ALJ erred in finding he did not have a bending limitation and the ALJ lacked substantial evidence in which to find that he was only occasionally limited in climbing stairs and ramps, stooping, kneeling, crouching and crawling.  ECF Dkt. #17 at 20.  He cites to evidence in the record showing that his lumbar range of motion was limited, including his hip flexion, in part due to his morbid obesity.  *Id.* at 20-21.  He also notes that he cannot sustain activities such as standing, walking and sitting for a significant duration of time and he cites to his testimony and statements in the record as support.  *Id.* at 21.  Plaintiff complains that "common sense dictates that some with spine disorders, extreme obesity, and chronic pain could not sustain these activities for up to 1/3 of a given work day (or up to two hours per day), as found by the ALJ."  *Id*. at 22.

The ALJ cited to Plaintiff's testimony about these limitations in the decision.  He noted that Plaintiff testified that he was limited in standing and walking for thirty minutes at one time.  Tr. at 16.  He also noted Plaintiff's testimony that his conditions caused pain and limited his abilities to perform physical tasks, including sitting, bending, kneeling, walking and standing.  *Id.*  The ALJ further indicated that Plaintiff's obesity exacerbated his symptoms.  *Id.*  However, the ALJ cited to the x-rays showing only mild degenerative changes and disc space narrowing, which revealed little worsening in the severity of Plaintiff's back impairment since he last worked full time.  *Id.*  He noted occasions

-29-

where Plaintiff presented to medical providers with decreased ranges of motion but he also noted many  other times where only minimal decreased ranges of motion existed.  *Id*.  The ALJ noted Plaintiff's non-use of prescription pain medications and the fact that no treating physician opined that he was limited in work-related activities.  *Id*.  He also cited to the occupational therapist's opinion that Plaintiff was capable of light work.  *Id.*  The therapist opined that Plaintiff demonstrated the physical capacities to perform work at the light exertional level, yet the ALJ gave Plaintiff's pain allegations some credence and limited him to sedentary work.  *Id*. at 282.  Finally, the ALJ cited to the agency examining physician's opinion that Plaintiff could perform sedentary work with no limitations, and Plaintiff's daily activities of driving, visiting with friends and family and his ability to negotiate steps multiple times per day.  *Id*. at 16-18.  The undersigned recommends that the Court find that the ALJ provided a proper RFC analysis and substantial evidence supports the ALJ's RFC for Plaintiff.

In passing, the undersigned observes that the two agency reviewing physicians who provided written disability determinations combined limitations as to bending into the categories of stooping and crouching when they opined that Plaintiff was limited to occasionally performing these postural movements.  Tr. at 73, 83.  The postural limitations parts of their forms state: "Stooping (i.e., bending at the waist)" and "Crouching (i.e.,  bending at the knees)".  *Id*.  The ALJ cited to these opinions and while he gave them little weight because they opined light work, he limited Plaintiff to occasional stooping and crouching.  *Id.* at 15.  It is therefore possible that the ALJ's stooping and crouching limitations included limitations for bending as well.

Plaintiff also asserts that substantial evidence does not support the ALJ's RFC limitation that he be allowed to alternate between sitting, standing and shifting positions at will so long as he would be off task only five percent of the time.  ECF Dkt. #17 at 21-22.  Plaintiff contends that his obesity and chronic pain would cause him to be off task more than five percent of the time since five percent of the time per hour is three minutes per hour and he testified that he required breaks after very short

-30-

periods of exertion, he cannot sit for more than a few hours per day, and he needs to stand and stretch after sitting for thirty to forty-five minutes.  *Id*. at 21.

The undersigned recommends that the Court find that substantial evidence supports the ALJ's determination regarding the five percent off task limitation.  No treating physician placed such a limitation on Plaintiff, the objective medical evidence showed only mild degenerative changes in his back, Dr. Gerblich examined Plaintiff and found that he could perform sedentary work with no limitations, the occupational therapist opined that Plaintiff could perform light work, and the agency consulting physicians opined that Plaintiff could perform light work as well and mentioned nothing about an off task limitation.  Nevertheless, the ALJ gave Plaintiff's testimony the benefit of the doubt and limited him in such a manner due to his combination of impairments and pain.  Tr. at 18. Accordingly, the undersigned recommends that the Court find no merit to this assertion.

### E.  CREDIBILITY

Plaintiff lastly contends that substantial evidence does not support the ALJ's credibility finding and the ALJ failed to follow the directives of SSR 96-7p in analyzing his credibility.  ECF Dkt. #17 at 22-25.  The undersigned recommends that the Court find no merit to this assertion.

The social security regulations establish a two-step process for evaluating pain.  *See* 20 C.F.R. § 404.1529 , SSR 96-7p.   In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could

-31-

reasonably be expected to produce the individual's pain or other symptoms.  *See id.*  Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p.  *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors.  *Felisky*, 35 F.3d at 1039-40.  Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

In this case, the first prong is satisfied because the ALJ determined that Plaintiff had the severe impairments of DDD, status-post remote replacement of Harrington rods, obstructive sleep apnea and morbid obesity which could "reasonably be expected to cause the alleged symptoms. "  Tr. at 16. Therefore, the remaining question concerns the ALJ's credibility determination related to Plaintiff's complaints of pain.

Plaintiff asserts that the ALJ did not follow SSR 96-7p when assessing his credibility as the Ruling requires him to consider more than just the objective medical evidence. ECF Dkt. #17 at 22-23. Plaintiff is correct that SSR 96-7p requires that the ALJ consider not only the objective medical evidence of record when evaluating a claimant's credibility, but also many other factors, including the claimant's statements about his symptoms, statements by treating and examining physicians and any other relevant evidence in the record. SSR 96-7p. The Ruling further states that:

> When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

The ALJ cited to SSR 96-7p in his decision and the seven additional factors that he was required to consider. Tr. at 16-17. The ALJ then addressed those factors, beginning with the objective

medical evidence which provided little change in the worsening of Plaintiff's back disorder since he was last able to work full time and the opinions of the occupational therapist and the agency examining physician who opined that he could perform light work and sedentary work, respectively, despite his impairments and complaints of pain. The ALJ also addressed the location, duration and intensity of Plaintiff's symptoms, noting his testimony and the medical evidence establishing his surgery as a child and the x-rays showing disc space narrowing at L5-S1 and mild degenerative changes. *Id.* at 16-17. The ALJ further noted Plaintiff's treatment course, which included no hospitalization or emergency care, no prescriptive pain medication at the time, and his physical therapy. *Id.* at 17-18. The ALJ also noted Plaintiff's testimony that his impairments caused him difficulty in performing physical tasks and that he could not stand or walk for more than thirty minutes at a time. *Id.* at 16. The ALJ additionally cited to the written statements by Plaintiff's friends and relatives that Plaintiff had pain which prevented him from sitting, standing and walking for long periods of time. *Id.* at 16, 18.

Plaintiff complains that the ALJ erred in discounting his credibility based upon alleged inconsistent statements and the occupational therapist's statement that he put forth submaximal effort at the disability evaluation. ECF Dkt. #17 at 23-24. The ALJ first noted that Plaintiff had been able to work for many years despite his back impairment, sleep apnea and obesity, which all existed and continued well before his alleged onset date and had not worsened significantly since then. Tr. at 17. The ALJ also indicated that while some of the medical records indicated that Plaintiff refused a CPAP machine, Plaintiff testified at the hearing that he was never prescribed a CPAP machine. Tr. at 17. The ALJ also noted that the records indicated that Plaintiff reported that he was laid off from his job and filed for disability because his unemployment compensation ran out, while other records indicated that Plaintiff reported that he quit his job because of back pain. *Id.* The ALJ stated that while these inconsistencies were not the result of an intent to mislead, they suggested to him that the information

provided by Plaintiff was not entirely reliable.  *Id.*

The record supports the ALJ's findings. Dr. Koniarnczyk's November 2, 2011 treatment notes indicated that "Pt refuses CPAP or repeat study."  Tr. at 290.  The ALJ inquired about this at the hearing and Plaintiff testified that he was never offered the use of the CPAP and he would have used one if he could as his brother and father both have them.  *Id.* at 48-49.  The record also contains notations that Plaintiff had reported both that he was applying for disability because his unemployment compensation ran out after he was laid off and that he left his job or was laid off because his back pain made it too difficult to perform the job.  *Id.* at 223, 248, 283, 326.  The Sixth Circuit has held that a claimant's receipt of unemployment benefits is "inherently inconsistent" with seeking disability benefits and an ALJ can consider this inconsistency in determining the claimant's credibility. *Workman v. Comm'r of Soc. Sec.*, 105 Fed. App'x 794, 801-802 (6th Cir. 2004)("[t]here is no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.").  And the records show that Plaintiff had the severe impairments found in this case well before his alleged onset date yet he was able to work full-time for many years and the medical records show that those impairments had not significantly worsened since the onset date. *Id.* at 29, 32-33, 204, 223-225, 229-230, 242, 248-250, 252-254, 271-272, 283, 310, 321, 324, 364-365.

Further, the occupational therapist who performed the disability evaluation did state that Plaintiff's grip test showed an inconsistency that may be indicative of submaximal effort. Tr. at 283. The ALJ noted this statement in his discussion of the occupational therapist's opinion, indicating that "the findings of the physical capacities exam indicate the claimant put forth submaximal effort in at least some portions of the test." *Id.* at 18.  Plaintiff is correct that the submaximal effort was only related to the grip strength portion of the test. *Id.* at 283.  However, the ALJ's error in applying this to more than one portion of the evaluation is not critical and actually benefitted Plaintiff because it

caused the ALJ to attribute less  weight to the occupational therapist's opinion that Plaintiff could perform light work due to the submaximal effort.  *Id*. at 18.  The ALJ limited Plaintiff to sedentary work.  *Id*. at 15.

The undersigned recommends that the Court find no merit to Plaintiff's assertions concerning errors in the ALJ's credibility analysis.  As explained above, the ALJ discussed the proper factors in evaluating Plaintiff's credibility, including those in SSR 96-7p, and properly considered statements in the record that presented inconsistencies.  The ALJ did not solely rely upon those inconsistencies in evaluating Plaintiff's credibility, as he also considered the objective medical evidence, Plaintiff's work history, the statements of Plaintiff's physicians and therapists, and the statements of Plaintiff and his friends and relatives.  The Court should find that substantial evidence supports the ALJ's credibility analysis.

**VII**.   **CONCLUSION AND RECOMMENDATION**

For the above reasons, the undersigned recommends that the Court AFFIRM the  decision of the Commissioner and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Dated: June 9, 2014                                    ***/s/ George J. Limbert***
                                                              GEORGE J. LIMBERT
                                                              UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).